UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MARTIN POST, JILL POST, JUDITH  :
A. DARK and WILLIAM LANGLAIS, :
on behalf of themselves and   :
others similarly situated,    :
            :
   Plaintiffs,     :
            :
  v.        :  Case No: 5:07-CV-252
            :
KILLINGTON, LTD., AMERICAN  :
SKIING COMPANY, SP LAND   :
COMPANY, LLC, SP II RESORT, LLC, :
KILLINGTON/PICO SKI RESORT  :
PARTNERS, LLC, and S-K-I, LTD., :
            :
   Defendants.    :

## OPINION and ORDER
## RE: DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
## AND JOINT MOTION TO BIFURCATE
(Docs. 170, 171, 174 & 176)

This matter came before the court on March 8, 2010 for oral argument on all pending motions. By separate Order, the court has ruled on Defendants' motions to strike. (Doc. 211.) In that Order, the court denied Plaintiffs' supplementation of the record with certain additional undisputed facts. It also struck references in the Post and Dark affidavits, submitted by Plaintiffs, that either directly conflicted with the affiants' deposition testimony or contained inadmissible hearsay. Presently pending before the court are Defendants' motions for summary judgment and joint motion to bifurcate.

Plaintiffs and Class Representatives, Martin Post, Jill Post, Judith A. Dark, and William Langlais ("Plaintiffs"), are represented by William B. Miller, Esq., Mitchell L.

Pearl, Esq., Peter F. Langrock, Esq., and Erin Miller Heins, Esq. Defendants, Killington, Ltd., American Skiing Company ("ASC"), and S-K-I, Ltd., are represented by Gary F. Karnedy, Esq. and Alexandra H. Bolanis, Esq. Defendants, SP Land Company, LLC ("SP Land") and SP II Resort, LLC ("SP II Resort") are represented by Alan S. Loewinsohn, Esq., Carol E. Farquhar, Esq., P. William Stark, Esq., and Robert Hemley, Esq. Defendant, Killington/Pico Ski Resort Partners, LLC, ("KSRP") is represented by Karen McAndrew, Esq. and Angela R. Clark, Esq.

This case arises out of the 2007 sale of the Killington Ski Resort and the impact that sale had on Plaintiffs' entitlement to free skiing pursuant to certain AT and P Passes. The Defendants' motions for summary judgment collectively present the following issues for resolution. First, are Plaintiffs' AT and P Passes ambiguous such that there is a genuine issue of material fact regarding whether certain Defendants have breached their obligation to honor them? Second, did the sale of the Killington Ski Resort constitute a *de facto* merger/mere continuation of the selling and buying corporations such that Killington, Ltd.'s obligations under the AT and P Passes survived the sale? And third, is there a genuine issue of material fact regarding whether certain Defendants have breached the implied covenant of good faith and fair dealing?

## I. The Undisputed Facts.

The parties agree that a majority of the operative facts are undisputed.[1] Because of the byzantine nature of their transactions as well of those of their predecessors, the court recites the facts at some length, although it ultimately concludes that a relatively limited

---

[1] Although the court struck the Plaintiffs' statement of additional facts as unauthorized by the applicable rules, the court nonetheless considers Plaintiffs' arguments that: (1) various supervisory personnel at the Ski Resort believed and stated that the AT and P Passes could not be terminated; and (2) the current operation of the Ski Resort involves the same assets, many of the same managers, the same phone number, the same location, and many of the same employees as Killington, Ltd. used in its operations. These facts are integral to Plaintiffs' arguments and are undisputed.

number of facts are material to its analysis.

A. *The Pass Incentives.*

On April 6, 1956, Sherburne Corporation ("Sherburne") was founded for the purpose of developing a ski resort on land owned by the State of Vermont on and around Killington Peak (the "Killington Ski Resort"). Rather than purchasing the land outright, Sherburne entered into a lease with the State of Vermont for a portion of the land upon which the Killington Ski Resort was to be developed and is still located.

In 1956, in order to obtain capital for its new venture, Sherburne presented the following incentive to potential investors:

> [A]ny purchase[r] who invests $1,000 or more in the company by purchasing four or more shares of the common stock shall receive for each $1,000 so invested a pass entitling the holder to use free all ski lifts operated by the corporation at Killington Basin so long as the corporation shall operate in that area under an agreement with the State of Vermont. The passes shall be transferable once each calendar year upon notification to the corporation.

(the "Pass Incentive"). From 1956 to 1961, Sherburne included the Pass Incentive in its stock and bond sales. Investors who acquired the Pass Incentives were able to transfer their annually-issued season ski passes once each calendar year ("AT Passes"). After 1961, Sherburne's Pass Incentives were transferable by the investor only once while they remained in effect ("P Passes").

Between 1956 and 1968, each investor in Sherburne who purchased $1,000 in stocks or bonds received a pass certificate stating:

> This certifies [name of holder] is the owner of record of Pass No. [##], entitling the holder to the free use of all ski lifts operated by Sherburne Corporation at Killington Basin so long as the corporation shall operate in that area under an agreement with the State of Vermont.

B. *Sherburne Becomes Killington Ltd. and S-K-I, Ltd. Becomes Its Parent.*

In 1984, Sherburne formed a holding company, S-K-I, Ltd., and became its

3

subsidiary. Approximately one year later, Sherburne was renamed Killington, Ltd. The Pass Incentive was revised to reflect this name change:

> This certifies [name of holder] is the owner of record of Pass No. [##], entitling the holder to the free use of all ski lifts operated by Killington, Ltd. at Killington Ski Area so long as the corporation shall operate in that area under an agreement with the State of Vermont.

## C. *The 1996 Merger: S-K-I, Ltd. Becomes a Subsidiary of ASC.*

In 1996, S-K-I, Ltd., as the parent corporation of Killington, Ltd., entered into a plan of merger with LBO Resort Enterprises and LBO Acquisition Company for the purchase of stock. Following the merger, LBO Resort Enterprises was renamed American Skiing Company ("ASC"), and S-K-I, Ltd. became a wholly-owned, indirect subsidiary of ASC. The merger had no effect on the AT and P Passes as Killington, Ltd. remained in existence and continued to operate the Killington Ski Resort pursuant to an agreement with the State of Vermont.

## D. *SP Land Enters the Picture.*

In 1999, Killington, Ltd. conveyed certain real estate parcels included in the Killington Ski Resort to its affiliate, American Skiing Company Resort Properties, Inc., ("ASCRP"). Thereafter, ASCRP pledged these same parcels as security for a loan from Fleet Bank and Ski Partners 2000.

In 2002, ASCRP defaulted on the loan. In 2004, as part of an agreement to cure the default, the mortgaged real estate parcels, as well as additional lands owned by Killington, Ltd., were transferred to SP Land, a newly-formed real estate development company. Following these conveyances, Ski Partners, LLC, Killington, Ltd.,[2] and ASCRP each held an interest in SP Land. Again, these transactions had no immediate impact on the AT and P Passes as Killington, Ltd. remained in existence and continued to

---

[2] Killington, Ltd.'s interest in SP Land was always a minority interest.

operate the Killington Ski Resort pursuant to an agreement with the State of Vermont.[3]

E. *Pico and Killington are Combined into one Ski Resort.*

By 2006, ASC owned both the Killington Ski Resort as well as the adjoining Pico Ski Resort (collectively, the "Ski Resort") through its subsidiaries Killington, Ltd. and the Pico Ski Area Management Company ("PSAMC"). Killington, Ltd. operated and managed the Killington Ski Resort. PSAMC operated and managed the Pico Ski Resort. Allen Wilson was President and Managing Director of both Killington, Ltd. and PSAMC. Rich McGary was Vice President of Resort Operations at the Ski Resort. This arrangement had no impact on the AT and P Passes, as Killington, Ltd. remained in existence and continued to operate the Killington Ski Resort pursuant to an agreement with the State of Vermont.

F. *The Purchase and Sale of the Ski Resort.*

In 2006, SP Land, in its capacity as a real estate development company, and Powdr Corporation, a Utah-based ski resort management company ("Powdr"), discussed the joint purchase of the Ski Resort. At the time, the two entities had no business relationship. On November 16, 2006, SP Land and Powdr entered into a "letter of intent" regarding the acquisition of the Ski Resort. This letter of intent envisioned a transfer of assets, not stock.

On February 16, 2007, SP Land, as the "Buyer," entered into a purchase and sale agreement for all of the assets and certain liabilities of the Ski Resort with Killington, Ltd., ASC, and PSAMC (collectively, the "Sellers") for $83.5 million (the "Purchase Agreement"). The parties dispute whether this was a "pure asset sale." It is undisputed, however, that the transaction did not involve a transfer of stock.

---

[3]    In support of their *de facto* merger/mere continuation claim, Plaintiffs point out that prior to the closing ASCRP also had a 1% interest in SP Land. ASCRP was not a party to the Purchase Agreement, it is not a Current Owner of the Ski Resort, and it is not a defendant in this action. Accordingly, the fact that ASCRP *had* a minority interest in SP Land is not material to the court's analysis.

The Purchase Agreement provides that the Buyer, SP Land, could assign its rights to one or more affiliates of E2M Partners, LLC ("E2M") or Powdr. E2M is a Texas-based real estate investment firm, whose sole member is Ski Partners II, LLC.

Section 8.23 of the Purchase Agreement further provides that the Buyer, SP Land, will honor 37 "lifetime" passes set forth on a schedule attached to the Purchase Agreement. The Plaintiffs' names were not listed on that schedule, nor were the names of any of the class members. In Section 2.4(b) of the Purchase Agreement, SP Land disclaimed the assumption of any liabilities of the Sellers other than those expressly assumed under the terms of the Purchase Agreement.

G. *ASC's SEC Filing.*

On or about March 9, 2007, ASC filed, among other things, a Schedule 14C with the United States Securities and Exchange Commission (the "SEC"). In its Definitive Information Statement, ASC summarized the Purchase Agreement's contents, including the Buyer's agreement in Article VIII to honor all "lifetime" passes indefinitely and to cause "any agreement for the sale of Killington/Pico to require the subsequent owner to honor such passes." As noted previously, these "lifetime" passes are specifically identified in the Purchase Agreement and do not include Plaintiffs' AT and P Passes or those of the class members. ASC's Definitive Information Statement further advised that "[c]opies of the purchase agreements were included with [ASC's] Form 8-K filed with the [SEC] on March 6, 2007. Please see 'WHERE TO OBTAIN MORE INFORMATION' for information about how you may obtain copies of the Purchase Agreements."

H. *Formation of Entities Prior to Closing.*

For tax purposes and other reasons, a number of entities were formed in preparation for the sale of the Ski Resort and its subsequent operation. On February 8, 2007, KSRP was formed for the purpose of operating and managing the Ski Resort after the closing. KSRP is jointly owned by two members, Killington Mountain Resort

6

Holding Company (a Powdr subsidiary) and Ski Partners II, LLC (an E2M affiliate).

On March 2, 2007, MTB Killington, LLC ("MTB") and AMSC Killington, LLC ("AMSC Killington") were formed. Both of these entities are indirect subsidiaries of Powdr and were formed to assume Powdr's interests in the transaction.

On March 15, 2007, SP II Resort was formed. It is an affiliate of E2M.

I. *The AT and P Passes are Disclosed but not Included in the Purchase Agreement.*

On March 29, 2007, approximately seven weeks after the execution of the Purchase Agreement but before the closing, the Sellers (Killington, Ltd., ASC, and PSAMC), disclosed the existence of the AT and P Passes to Buyer SP Land. Ultimately, SP Land and its assignees refused to honor the AT and P Passes and the contracting parties did not include them in the Purchase Agreement.

J. *Ownership and Rights of SP Land Change as Part of the Closing.*

On May 9, 2007, Buyer, SP Land, assigned nearly all of its rights under the Purchase Agreement to SP II Resort, AMSC Killington, and MTB (collectively, the "Current Owners"). SP Land, however, did not assign its rights to purchase the following assets: Killington, Ltd.'s interest in SP Land; ASCRP's interest in SP Land; and a 50% interest in Cherry Knoll Associates, LLC. Instead, SP Land planned to "redeem" those interests as part of the closing. Accordingly, although one of the Sellers, Killington, Ltd., had an interest in the Buyer, SP Land, prior to the closing, the transaction was structured so that this relationship did not survive the closing.

K. *The Closing.*

On May 10, 2007, the sale of the Ski Resort closed. As part of the closing, the Current Owners took title to the Ski Resort's assets as tenants in common and accepted assignments of the leases with the State of Vermont. Simultaneously, and in conjunction with the closing, all of ASCRP's and Killington, Ltd.'s ownership interests in SP Land were redeemed by SP Land.

Following the closing, the Sellers (Killington, Ltd., ASC, and PSAMC) had no

ownership interest in, and were not owned by, the Buyer, SP Land, its assignees, or the Current Owners (SP II Resort, AMSC Killington, and MTB).

Also following the closing, neither Sherburne nor Killington, Ltd. operated the ski lifts at the Ski Resort under an agreement with the State of Vermont or otherwise.

L. *The Aftermath.*

After the closing, former President and Managing Director, Allen Wilson, and Vice President of Resort Operations, Rich McGary, ceased their employment at the Ski Resort.

KSRP currently manages and operates the Ski Resort pursuant to a lease with the Current Owners which grants KSRP use of the Ski Resort's assets. Chris Nyberg is the President and General Manager of KSRP. KSRP has no ownership interest in or contract with the Sellers (Killington, Ltd., ASC, and PSAMC), and vice-versa. There is also no contract between Plaintiffs and KSRP, or between Plaintiffs and the Current Owners.

After the closing, many of Killington, Ltd.'s managers and employees, including vice presidents, remained employed at the Ski Resort. The Ski Resort also maintains the same telephone number and continues operations with the same assets in the same location.

On August 31, 2007, Killington, Ltd. and PSAMC each merged into their parent corporation, S-K-I, Ltd. Accordingly, Killington, Ltd. is no longer an active corporation. Since the closing, S-K-I, Ltd. remains an active corporation.

ASC did not transfer all of its assets through the Purchase Agreement; it still owned three ski resorts in other parts of the country. Following the closing, ASC entered into agreements to sell its remaining assets to unrelated entities. In September 2007, ASC filed a certificate of dissolution, although it continues in existence to wind up its affairs.

M. *The Class Members.*

Plaintiffs and class representatives, Martin Post and Jill Post, each received and now own a P Pass as the result of a transfer. Plaintiff and class representative, Judith

Dark, owns a P Pass that has never been transferred. Plaintiff and class representative, William Langlais, owns an annually transferable AT Pass.

Plaintiffs represent a class of individuals defined as "the owners of all extant investor passes." (Doc. 94 at 10.) The current litigation involves 342 AT Passes and 901 P Passes.

In Count I of their Complaint, Plaintiffs allege that Defendants SP Land, SP II Resort, and KSRP have breached their obligations to honor the AT and P Passes. In Count II, they allege that Defendants Killington, Ltd., ASC, SP Land, and S-K-I, Ltd. owed a duty to properly disclose and protect the AT and P Passes and, by failing to perform this duty, have thereby breached the implied covenant of good faith and fair dealing. Plaintiffs seek compensatory and injunctive relief and an award of attorney's fees and costs.[4]

## II. Conclusions of Law and Analysis.

The court's jurisdiction over this case is based upon diversity of citizenship. Accordingly, the court analyzes Plaintiffs' claims in accordance with Vermont law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78-79 (1938); *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005).

In separate motions and for various reasons, the Defendants collectively seek summary judgment on each count of Plaintiffs' Complaint. Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[4] At this juncture, Plaintiffs have not specified the basis for an attorney's fees award.

In making this determination, the court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted).

"When moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant can satisfy its burden of establishing that there is no genuine issue of material fact in dispute by pointing to an absence of evidence to support an essential element of the non-moving party's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

## A. <u>Count I: Breach of Contract.</u>

1. *Whether Certain Defendants Have Breached the AT and P Passes.*

In Count I of their Complaint, Plaintiffs assert that Defendants SP Land, SP II Resort, and KSRP "are obligated to honor the lifetime passes in accordance with their original terms" and by "failing to honor the lifetime passes," they "have breached their obligations to Plaintiffs," causing them to suffer damages. Complaint ¶¶ 34-36. In support of this claim, Plaintiffs assert that the language of the AT and P Passes is "far from unambiguous" and can reasonably be construed to require any corporation that operates a ski resort in the Killington basin under an agreement with the State of Vermont to honor the passes because the term "corporation" is not capitalized. They further assert that rules of contract construction require the court to insert the words "successors and assigns" after the term "corporation" in the passes such that Killington, Ltd.'s successors and assigns must honor the AT and P Passes. At issue is the following contractual language:

> This certifies [name of holder] is the owner of record of Pass No. [##], entitling the holder to the free use of all ski lifts operated by [Sherburne/]Killington, Ltd. at [Killington Basin/]Killington Ski Area so long as the corporation shall operate in that area under an agreement with

the State of Vermont.

"It is hornbook law that construction of contract terms is a matter of law and not a factual determination." *Ianelli v. Standish*, 156 Vt. 386, 389, 592 A.2d 901, 903 (1991) (quoting *Vermont Nat'l Bank v. Chittenden Trust Co.*, 143 Vt. 257, 266, 465 A.2d 284, 290 (1983)). Courts thus "interpret contracts to give effect to the parties' intent, which [the court] presume[s] is reflected in the contract's language when that language is clear." *R & G Properties, Inc. v. Column Fin., Inc.*, 2008 VT 113, ¶ 17, 184 Vt. 494, 968 A.2d 286 (citation omitted). Under Vermont law, a contract is ambiguous "only to the extent that reasonable people could differ as to its interpretation." *Trustees of Net Realty Holding Trust v. AVCO Fin. Servs. of Barre, Inc.*, 144 Vt. 243, 248, 476 A.2d 530, 533 (1984).

The language of the AT and P Passes is clear and unambiguous. The only reasonable interpretation of that language is that it requires Killington, Ltd. to provide the designated passholder free use of all ski lifts operated by Killington, Ltd. at the Killington Ski Area so long as it operates in that area under an agreement with the State of Vermont. The term "the corporation" clearly refers to the named corporations, Sherburne and Killington, Ltd. *See R & G Properties, Inc.*, 2008 VT 113, ¶ 17, 184 Vt. 494, 968 A.2d 286 ("We also strive to 'give effect to every part . . . and form a harmonious whole from the parts' of a contract.") (quoting *In re Verderber*, 173 Vt. 612, 615, 795 A.2d 1157, 1161 (2002)). Plaintiffs' suggestion that, in the absence of a capital "C," the term "corporation" refers to any corporation operating a ski resort in the Killington basin under an agreement with the State of Vermont would impose obligations on strangers to the contract.[5] *See* 17a Am.Jur.2d § 421 (1995 Supp.) ("Parties to a contract cannot thereby impose any liability on one who, under its terms, is a stranger to the contract, and in any

---

[5] Plaintiffs' interpretation would also require any corporation that operated a ski resort in the Killington area and leased land from the State of Vermont to offer free skiing to Plaintiffs under the AT and P Passes even if the corporation received nothing in return.

event, in order to bind a third person contractually, an expression of assent by such person is necessary."); *Johnson v. Coleman*, 288 S.W.2d 348, 349 (Ky. 1956) (the fact that one of the parties intended that the successor of the other party should be bound by the contract cannot make the successor liable).

Plaintiffs' further suggestion that the duration of Killington, Ltd.'s obligation under the AT and P Passes is limited only by the existence of an agreement with the State of Vermont is nonsensical. *See State v. Philip Morris USA Inc.*, 2008 VT 11, ¶ 18, 183 Vt. 176, 945 A.2d 887 ("nonsensical" interpretations of contracts are disfavored because people are unlikely to make contracts with absurd consequences) (citing *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 284-85 (7th Cir. 2002)). According to Plaintiffs' interpretation, even if Killington, Ltd. was no longer operating a ski resort in the area, it would still be required to offer free skiing to AT and P Pass holders until its agreement with the State of Vermont had expired. Not only does this interpretation contravene the plain language of the AT and P Passes, it would potentially require Killington, Ltd. to operate a ski resort for the AT and P passholders' sole benefit.

Plaintiffs' contention that "senior management at the ski resort has historically interpreted the passes differently than Defendants" (Doc. 184 at 16) does not create an ambiguity where one does not otherwise exist. A party cannot create an ambiguity by citing an unreasonable interpretation of unambiguous contract language or by pointing to extrinsic evidence in an attempt to vary the contract's terms. *See Harsch Properties, Inc. v. Nicholas*, 2007 VT 70, ¶ 12, 182 Vt. 196, 932 A.2d 1045 ("We construe the meaning of [a contract] by examining the plain meaning of the language without resort to extrinsic evidence."); *see also Downtown Barre Dev. v. C & S Wholesale Grocers, Inc.*, 2004 VT 47, ¶ 8, 177 Vt. 70, 857 A.2d 263 (circumstances surrounding the making of an agreement "may not be used to vary the terms of an unambiguous writing.") (citation omitted).

Perhaps in recognition of the unreasonableness of their interpretation of the AT

and P Passes, Plaintiffs ask the court to "read into" the passes a requirement that Killington, Ltd.'s obligations are binding upon its successors and assigns. The sole authority Plaintiffs cite in support of this request does not support it. *See Williston on Contracts* § 74:10.[6] The plain language of the AT and P Passes reveals no intention to bind Killington, Ltd.'s successors and assigns. To the contrary, Killington, Ltd.'s obligations under the passes clearly terminate with its cessation of operations in the area. Courts may not "rewrite unambiguous contractual terms to grant one party a better bargain than the one it made." *Downtown Barre Dev.*, 2004 VT 47, ¶ 14, 177 Vt. 70, 857 A.2d 263 (quoting *Rouse-Randhurst Shopping Ctr., Inc. v. J.C. Penney Co.*, 171 F. Supp. 2d 824, 827 (N.D.Ill. 2001)). Rather, the court's obligation is "to give effect to the intention of the parties as stated in their writing." *H.P. Hood & Sons v. Heins*, 124 Vt. 331, 336, 205 A.2d 561, 564 (1964).

In the instant case, the court gives effect to the parties' written intent by limiting Killington, Ltd.'s obligation under the AT and P Passes to its operation of a ski resort in the Killington area under an agreement with the State of Vermont. With regard to Defendants SP Land, SP II Resort, and KSRP, the court's analysis is by necessity more cursory. Plaintiffs fail to establish the existence of a contract between them and any of these Defendants. Certainly, none of these Defendants are parties to the AT and P Passes. Under Vermont law, in general, "no one can sue or be sued upon a contract who is a

---

[6] Plaintiffs' citation to *Williston on Contracts* for the proposition that "contractual rights and obligations are assumed by a successor absent specific, unambiguous language to the contrary" (Doc. 184 at 15) misconstrues the provision cited. The treatise merely notes that contractual rights *may* be assigned:

> Generally, all contract rights may be assigned in the absence of clear language expressly prohibiting the assignment and unless the assignment would materially change the duty of the obligor or materially increase the obligor's burden or risk under the contract or the contract involves obligations of a personal nature.

29 *Williston on Contracts* § 74:10 (4th ed.).

13

stranger to it." *Kelley v. Town of Moretown*, 71 Vt. 340, 45 A. 224, 225 (1899); *see also Ben & Jerry's Homemade, Inc. v. Coronet Priscilla Ice Cream Corp.*, 921 F. Supp. 1206, 1212 n.11 (D.Vt. 1996) ("[I]t is axiomatic to state that to prevail on a breach of contract claim, there must be a contract."). Plaintiffs seek to overcome the deficiencies in their breach of contract claims through the successor liability doctrine of *de facto* merger/mere continuation.

2. *Whether the De Facto Merger/Mere Continuation Exception Preserves Plaintiffs' Breach of Contract Claims.*

Plaintiffs contend that Killington, Ltd. should not be able to escape its obligations under the AT and P Passes through a sale that Plaintiffs claim was not at "arms length." Plaintiffs further argue that SP Land, SP II Resort, and KSRP should be required to honor the contractual obligations of one of the Sellers, Killington, Ltd., under the AT and P Passes as "successor corporations."

In a sale of corporate assets, a buyer does not ordinarily assume responsibility for the debts of a seller. *See Gladstone v. Stuart Cinemas, Inc.*, 2005 VT 44, ¶ 14, 178 Vt. 104, 878 A.2d 214 (in a "'sale of assets only,' the purchasing corporation assumes no liabilities of the selling corporation" unless an exception applies); *Ostrowski v. Hydra-Tool Corp.*, 144 Vt. 305, 307, 479 A.2d 126, 127 (1984) ("The essence" of the "general and traditional rules of corporate successor liability" is that "the liabilities of a predecessor corporation will pass to the successor only when the change is occasioned by statutory merger or consolidation."). Vermont law recognizes five exceptions to this general rule:

1. The buyer expressly or impliedly agrees to assume such liabilities;

2. The transaction constitutes a *de facto* merger or consolidation;

3. The purchasing corporation is a mere continuation of the selling corporation;

4.     The sale is a fraudulent transaction; or

5.     The corporate assets were sold for inadequate consideration.

*Gladstone*, 2005 VT 44, ¶ 14, 178 Vt. 104, 878 A.2d 214.

In support of their argument that Killington, Ltd.'s obligations under the AT and P

Passes survived the closing and may be imposed on Defendants, SP Land, SP II Resort,

and KSRP as "successor corporations," Plaintiffs rely upon the *de facto* merger and mere

continuation exceptions. Vermont law treats these exceptions as roughly equivalent. *Id.*

¶ 19 n.4 ("As they have evolved, there is little difference between the *de facto* merger

exception and the mere continuation exception. We view the name of the exception as

unimportant.") (internal citations omitted). In each instance, the exception requires a

"reincarnation" or "mere continuation" of the selling corporation:

> The mere continuation exception to the nonliability of successors
> applies when the transferee corporation is merely a continuation or
> reincarnation of the transferor corporation. In determining whether one
> corporation is a continuation of another, the test is whether there is a
> continuation of the corporate entity of the transferor not whether there is a
> continuation of the transferor's business operations.

> The traditional indications of "continuation" are: common officers,
> directors, and shareholders; and only one corporation in existence after the
> completion of the sale of assets. While the two foregoing factors are
> traditionally indications of a continuing corporation, neither is essential. In
> a "*de facto* merger" where one corporation is absorbed by another, there is
> continuity of the selling corporation evidenced by such things as the same
> management, personnel, assets, location and shareholders. Other factors
> such as continuation of the seller's business practices and policies and the
> sufficiency of consideration running to the seller corporation in light of the
> assets being sold may also be considered. To find that continuity exists
> merely because there was common management and ownership without
> considering other factors is to disregard the separate identities of the
> corporation without the necessary considerations that justify such an action.

*Id.*, ¶ 19 (citations omitted).

Plaintiffs acknowledge that they bear the burden of establishing a *de facto* merger/mere continuation. *See id.* ¶ 11 (party seeking to impose successor liability has the burden of establishing it). Repeatedly characterizing the parties' transactions as "complex" and "complicated," Plaintiffs assert that these complexities are more appropriately resolved by a jury rather than by the court. However, as demonstrated below, the facts necessary to analyze Plaintiffs' *de facto* merger/mere continuation claim are neither complicated nor disputed. As a result, the court analyzes the *Gladstone* factors in the context of the undisputed facts in the light most favorable to Plaintiffs.

    a. Whether There is Continuity of Ownership.

"The single most important factor for applying the mere continuation theory is the continuity of ownership and management." *Gladstone*, 2005 VT 44, ¶ 20, 178 Vt. 104, 878 A.2d 214. Arguably, this factor may be narrowed even further as there is no apparent authority for imposing successor liability in a contract case in the absence of a some form of continuity of ownership.[7] Although *Gladstone* asserts that "common officers, directors, and shareholders," and "only one corporation in existence after the completion of the sale of assets" are "traditional" rather than "essential" elements of the *de facto* merger/mere continuation doctrine, each of the cases cited by *Gladstone*,[8] and *Gladstone*

---

[7] At oral argument, the court inquired whether any party had found authority for the proposition that the *de facto* merger/mere continuation exception may be found in a contract dispute in the absence of continuity of ownership. No party was able to cite a case in support of this proposition and the court has found none. Courts that have not required a "continuity of ownership" have done so in the area of tort law under "product-line" and "continuity of enterprise" theories of successor liability. Vermont law, however, specifically rejects those theories. *See Ostrowksi*, 144 Vt. at 308, 479 A.2d at 127 ("We agree . . . that these theories do not speak the law of this state, and we decline to adopt them.").

[8] *See Dayton v. Peck, Stow & Wilcox Co.*, 739 F.2d 690, 693 (1st Cir. 1984) ("The key element of a 'continuation' is a common identity of the officers, directors and stockholders in the selling and purchasing corporations" and noting that "[o]ne of the key requirements for a merger under traditional corporation law doctrine is 'continuity of shareholders'"); *Kaiser Found. Health Plan v. Clary & Moore, P.C.*, 123 F.3d 201, 205-06 (4th Cir. 1997) ("The most critical element in proving a continuation is showing the same ownership of the two companies . . . [although]

16

itself, appears to find some continuity of ownership essential. *See id.,* ¶ 19 ("The critical factor in this case . . . is that the successor corporation is owned by the same stockholders as the predecessor corporation."). Accordingly,

> Courts will not generally find a case within either the mere continuation or de facto merger exceptions ***unless there is continuity of ownership between the selling and purchasing corporation.*** Continuity of ownership strongly suggests the absence of a bona fide transaction.

*Gallenberg Equip., Inc.,* 10 F. Supp. 2d at 1054 (emphasis supplied) (cited with approval in *Gladstone,* 2005 VT 44, ¶ 20, 178 Vt. 104, 878 A.2d 214); *see also Weaver v. Nash Int'l, Inc.,* 730 F.2d 547, 548 (8th Cir. 1984) (holding that successor corporation was not a "mere continuation" of its predecessor "where there was no identity of stock or stockholders between the purchasing and selling corporations.").

In this case, Plaintiffs have adduced no evidence of continuity of ownership. At best, they establish that *one* of the Sellers, Killington, Ltd, *had* a minority interest in Buyer, SP Land, prior to the closing on the Purchase Agreement. Plaintiffs cite no authority for finding a "continuity of ownership" on this basis. It thus remains undisputed that, after the closing, *Sellers did not have any ownership interest in the Buyer or any of its assignees and vice versa.* Plaintiffs have thus failed to establish that the Purchase Agreement resulted in a "continuity of ownership."

With regard to KSRP, evidence of "continuity of [Sellers'] ownership"--past or present--is non-existent. Indeed, KSRP is not a party to the Purchase Agreement and thus

---

absolutely identical ownership between the two corporations need not be present"); *Grand Labs., Inc. v. Midcon Labs of Iowa,* 32 F.3d 1277, 1283 (8th Cir. 1994) (holding that the key element is a "common identity of the officers, directors and shareholders" and observing that "mere continuation" cannot be found "where the two corporations had different owners"); *Gallenberg Equip., Inc. v. Agromac Int'l, Inc.,* 10 F. Supp. 2d 1050, 1054 (E.D.Wis. 1998) ("Continuity of ownership is the common thread" in *de facto* merger and mere continuation doctrines); *Vernon v. Schuster,* 688 N.E.2d 1172, 1176 (Ill. 1997) ("In accord with the majority view, our appellate court has 'consistently required identity of ownership before imposing successor liability under [the mere continuation exception].'") (citation omitted).

never occupied the status of Seller, Buyer, or Buyer's assignee. Moreover, KSRP does not own the Ski Resort's assets; it merely leases them.[9] In such circumstances, the *de facto* merger/mere continuation exception simply does not apply. *See Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 879 F. Supp. 407, 410 (D.Vt. 1995) (summary judgment granted because it is "axiomatic that to establish corporate successor liability there must, in fact, be a corporate successor.").

A close examination of the applicable law reveals that in this case, Plaintiffs' inability to establish "continuity of ownership" is fatal to their successor liability claim. The court nonetheless analyzes the remaining *Gladstone* factors to determine whether this flaw may be cured through other evidence.

b. <u>Whether There is Continuity of Management</u>.

To establish "continuity of management," Plaintiffs must establish that the "same or similar" management existed between the Sellers and the Buyer or its assignees. *Gladstone*, 2005 VT 44, ¶ 19, 178 Vt. 104, 878 A.2d 214. Courts have generally required "continuity of management" at the officer and director level. *Id.* ("The traditional indications of 'continuation' are: common officers [and] directors"); *Cab-Tek, Inc. v. E.B.M., Inc.*, 153 Vt. 432, 433, 971 A.2d 671, 671 (1990) (noting common directors of transferor and transferee corporation); *Leannais v. Cincinnati, Inc.*, 565 F.2d 437, 440 (7th Cir. 1977) ("The key element of a 'continuation' is a common identity of the officers, directors and stockholders of the selling and purchasing corporations."); *Berg Chilling Systems, Inc. v. Hull Corp.*, 435 F.3d 455, 470 (3rd Cir. 2006) ("There was no continuity of corporate management: no member of [seller's]'s Board of Directors held a position on [buyer's] Board of Directors."). The rationale for requiring "continuity of management"

---

[9] Plaintiffs point out that KSRP is owned in part by Ski Partners II, the entity that also owns SP II Resort, and that E2M manages both SP Land and Ski Partners II. These facts, however, in no way establish KSRP as a "successor corporation" to any of the Sellers or a purchaser or transferee of corporate assets from Sellers.

at the highest level is that it supports an argument that the same individuals who controlled the selling corporation are now controlling the purchasing corporation.

Plaintiffs assert that although they cannot demonstrate "continuity of management" at the director level, there is evidence that numerous managers, including several vice presidents, remain employed at the Ski Resort after the closing. Defendants do not dispute Plaintiffs' contention, but point out that Killington, Ltd.'s President/Managing Director and its Vice President of Resort Operations ceased their employment at the Ski Resort, and that the individual who currently "manages" the Ski Resort, Chris Nyberg, is employed by KSRP. Accordingly, at the highest level, they contend that there is no "continuity of management."

The court agrees that mid-level managers are generally not the type of "continuity of management" to which the *de facto* merger/mere continuation exception is directed. *See Myers v. Putzmeister, Inc.*, 596 N.E.2d 754, 756-57 (Ill. App. 1992) (concluding that neither the *de facto* merger nor the mere continuation exception applies where, despite "continuity of middle management employees," there is no "showing of common ownership between the seller and buyer"). These individuals are generally mere employees of the selling and purchasing corporations whose limited control of corporate assets is derived purely by virtue of their employment. Moreover, any control they exercise is generally at the direction of and subordinate to the control exercised by the assets' owner. *See Hwang Law Firm, LLC v. United States*, 2008 WL 2704316, at * 8 (E.D.Pa. July 9, 2008) ("Continuity of corporate management entails that common corporate officers have the power to bind both the predecessor and continuing corporate entities"). A *qualitative* analysis of the "continuity of management," however, is generally not appropriate at the summary judgment stage.[10] The court thus examines the

---

[10] Where there are reasonable inferences that may be drawn from the facts, the resolution is a question for the jury. *Monahan v. GMAC Mortgage Corp.*, 2005 VT 110, ¶ 47, 179 Vt. 167, 893 A.2d 298 (moving party's "competing inference cannot prevail on review by the Court because the drawing of legitimate inferences from the facts is a jury function."); *Lockwood v.*

evidence in the light most favorable to the Plaintiffs and concludes that the Plaintiffs have established some evidence of "continuity of management" in support of their *de facto* merger/mere continuation claim.

c. <u>Whether Only the Buyer Survived the Purchase and Sale.</u>

"The second most important factor for applying the mere continuation exception is whether only the successor corporation has survived." *Gladstone*, 2005 VT 44 ¶ 21, 178 Vt. 104, 878 A.2d 214. This factor does not require the selling corporation's immediate dissolution or bankruptcy. *Id.,* ¶¶ 21-22. Instead, it examines whether the selling corporation is either insolvent or has remaining assets of so little value that they are inadequate to satisfy a plaintiff's judgment or potential judgment. *Id.,* ¶ 21. As a condition precedent to this finding, courts generally require that all or most of the seller's assets be transferred to the buyer in the course of the transaction. *See, e.g., id.* ("We cannot, in fairness, permit the sole shareholder of one corporation to organize another and transfer all the corporate property from the former to the latter without paying all the corporation's debts."); *see also Cab-Tek, Inc.*, 153 Vt. at 435, 571 A.2d at 693 (finding *de facto* merger where there was a continuity of ownership and management between transferor and transferee corporation and where transferee "absorbed" transferor by taking control of all of its assets without consideration, and transferor "ceased to function."); *Wilson v. Fare Well Corp.*, 140 N.J.Super 476, 485-86, 356 A.2d 458, 464 (1976) (*de facto* merger found where one corporation sold all its assets, including good will, to another corporation, which continued in seller's business) (cited with approval in *Cab-Tek, Inc.*, 153 Vt. at 435, 571 A.2d at 672).

Application of this *Gladstone* factor reveals that Plaintiffs have established that

---

*Lord*, 163 Vt. 210, 217, 657 A.2d 555, 560 (1994) (recognizing that when evidence is open to multiple interpretations, the court cannot substitute its judgment for that of the jury in choosing the correct interpretation); 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2528, at 294 (3d ed.) ("[I]f the evidence reasonably might lead to either of two inferences it is for the jury to choose between them.").

Sellers, Killington, Ltd. and PSAMC, were merged into their parent corporation S-K-I, Ltd., several months after the closing. In addition, four months after the closing, Seller, ASC, filed a certificate of dissolution and is currently in the process of winding up its affairs.

Defendants counter that S-K-I, Ltd. remains an active corporation and that only some of Killington, Ltd.'s assets were conveyed to the Buyer at the closing. Moreover, after the closing, ASC remained an active corporation that still owned three ski resorts. Its subsequent sale of those ski resorts to unrelated parties and its dissolution, therefore, cannot be attributed to the Purchase Agreement or closing. Accordingly, Plaintiffs have not established that the Sellers were insolvent after the closing and that "[f]or all practical purposes, only [the successor corporations] remained after the asset sale." *Gladstone*, 2005 VT 44, ¶ 21, 178 Vt. 104, 878 A.2d 214 (quoting *In re Sunsport, Inc.*, 260 B.R. 88, 106 (Bank.E.D.Va. 2000)). Plaintiffs are thus unable to establish the "second most important" *Gladstone* factor.

### d. Whether the Purchase and Sale was Without Adequate Consideration.

"As a third factor, a number of jurisdictions hold that, for the mere continuation exception to apply, any assets transferred to the successor corporation must be transferred without adequate consideration." *Id.*, ¶ 23. In *Gladstone*, for example, "to the extent there were assets transferred, no consideration was provided for the transfers." *Id.* Similarly, in *Cab-Tek, Inc.*, the transferee corporation "took control over all of the [transferor's] assets without consideration." *Cab-Tek, Inc.*, 153 Vt. at 435, 571 A.2d at 673.

"[T]he question of 'whether there is consideration for a contract is a question of law, not fact.'" *Ferrisburgh Realty Investors v. Schumacher*, 2010 VT 6, ¶ 18, __ Vt.__, __ A.2d __ (quoting *Lloyd's Credit Corp. v. Marlin Mgmt. Servs., Inc.*, 158 Vt. 594, 598, 614 A.2d 812, 814 (1992)). "Sufficient consideration may [be] determined by '[e]ither a benefit to the promisor or a detriment to the promisee.'" *Id.* (citations omitted).

In this case, the assets of the Ski Resort were transferred for approximately $83.5 million, in addition to Buyer's agreement to assume certain liabilities of the Sellers. Plaintiffs assert that although inadequacy of consideration is by no means essential to successor liability, "the very nature of this transaction calls the adequacy of consideration into doubt." (Doc. 184 at 28.) This claim, however, remains a mere allegation unsupported by any factual evidence. *See Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) ("reliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion.") Having raised the *de facto* merger/mere continuation exception, Plaintiffs must establish sufficient evidence to support it. In the face of this burden, they proffer no evidence that the Purchase Agreement was supported by insufficient consideration–a deficiency that is arguably fatal to their claim. *See Ed Peters Jewelry Co., Inc. v. C & J Jewelry Co., Inc.*, 51 F. Supp. 2d 81, 95 (D.R.I. 1999) ("Plaintiff has failed to carry its burden of demonstrating inadequate consideration, and with this failure, the cause of action for successor liability based on 'mere continuation' dies on the vine.").

    e. Whether There is Continuity of Business Operations.

"A fourth factor is whether the successor business is the same business as the previous one." *Gladstone*, 2005 VT 44, ¶ 24, 178 Vt. 104, 878 A.2d 214. "In examining this factor, [the Vermont Supreme Court] emphasize[d] that, while continuation in the same business is relevant, continuity of business operations is less important than continuity of ownership and direction." *Id.* Indeed, the relevancy of this factor is subject to question as it is potentially present in every instance in which one corporation buys another corporation's key business assets with the intention of using them in the same line of business. For this reason, some authorities reject this as a factor for determining successor liability. *See* 15 *Fletcher Cyclopedia of the Law of Corporations* § 7124.10 at 298 ("In determining whether one corporation is a continuation of another, the test is whether there is a continuation of the corporate entity of the transferor, not whether there

is a continuation of the transferor's business operations.") (cited with approval in *Gladstone*, 2005 VT 44, ¶¶ 19, 24, 178 Vt. 104, 878 A.2d 214).

Plaintiffs have adduced abundant evidence that the Buyer or its assignees have continued operating the Ski Resort with the same telephone number, in the same location, and with the same assets as the Sellers. Indeed, they argue that "[t]he resort's seamless transition through the sale provides the most visible marker that the new Killington represents a 'mere continuation' or '*de facto* merger' of the old Killington." (Doc. 184 at 20.) The Defendants cite no evidence to the contrary. Accordingly, to the extent it remains a meaningful *Gladstone* factor, the court concludes that a "continuity of business operations" has been established.

   f. <u>Whether Fairness Requires the Buyer to Assume the Sellers' Obligations.</u>

In determining whether a *de facto* merger/mere continuation exception applies, the *Gladstone* court examined "another factor in this case that is not present in most of the decisions from other jurisdictions[:]"

> We cannot, in fairness, permit the sole shareholder of one corporation to organize another and transfer all the corporate property from the former to the latter without paying all the corporation's debts. The new corporation can only be regarded as a mere continuation of the former under a different name.

*Id.* (citations omitted).

Plaintiffs argue that this "fairness" factor supports a *de facto* merger/mere continuation finding. They point out that Sellers could have included the AT and P Passes in the Purchase Agreement, but ultimately opted not to do so. Moreover, they point out that the Buyer "selectively paid [the predecessor's] debts as necessary" in order to continue the Ski Resort's business operations. (Doc. 184 at 29, quoting *id.*, ¶ 25).

Although there is a superficial appeal to Plaintiffs' argument, it contravenes the purpose of the *de facto* merger/mere continuation exception. The exception applies only where the application of the more general rule, recognizing no successor liability in an

asset sale, would be unfair and inequitable. There is nothing inherently unfair or inequitable about Killington, Ltd. selling its interests in the Ski Resort to SP Land and its assignees for a significant sale price. However the transaction may be regarded, it was not a mere changing of hats. *See id.*, ¶ 26 (the "fairness" factor is directed at "the underlying theory of the [*de facto merger*/mere continuation] exception . . . that, if [a] corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability.") (quoting 15 *Fletcher Cyclopedia Corp.*, § 7124.10 at 301); *see also Bud Antle, Inc. v. Eastern Foods, Inc.*, 758 F.2d 1451, 1158 (11th Cir. 1985) (mere continuation exception applies where "the purchasing corporation is merely a 'new hat' for the seller, with the same or similar management and ownership."); *Ladjevardian v. Laidlaw-Coggeshall, Inc.*, 431 F. Supp. 834, 839 (S.D.N.Y. 1977) ("For this exception to come into operation 'the purchasing corporation must merely represent a new hat for the seller'") (citation and internal quotations omitted).

Here, *Gladstone*'s "fairness factor" has no application as there is no evidence that Killington, Ltd. underwent a mere change in form without a significant change in substance and thereby escaped its liability to Plaintiffs under the AT and P Passes.

In summary, the AT and P Passes unambiguously limit Killington, Ltd.'s obligation to provide free skiing to Plaintiffs to the duration of its operations in the Killington area under an agreement with the State of Vermont. It is undisputed that those operations have ceased. In such circumstances, no breach of contract has been established against any of the named Defendants. Plaintiffs argue that their breach of contract claim nonetheless survives summary judgment on a *de facto* merger/mere continuation theory. Examining the evidence in the light most favorable to Plaintiffs, the court finds that Plaintiffs have not established their claim. Although they proffer evidence of a "continuity of management" and a "continuity of operations," Plaintiffs cite no authority for the proposition that such evidence is sufficient to establish the *de facto* merger/mere continuation exception, and the court has found none. Without some evidence of "continuity of ownership" and

24

insufficient consideration, the court finds no factual, legal, or equitable basis for imposing "successor corporation" liability on any of the named Defendants. *See Gladstone*, 2005 VT 44, ¶ 24, 178 Vt. 104, 878 A.2d 214.

Summary judgment should be granted when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see also Gallo v. Prudential Residential Servs. Ltd. P'ship*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). Here, that standard has been satisfied. Defendants SP Land, SP II Resort, and KSRP's motions for summary judgment with regard to Count I of the Complaint are therefore GRANTED.

## B. Count II: Breach of the Implied Covenant of Good Faith and Fair Dealing.

In Count II of their Complaint, Plaintiffs allege that Defendants Killington, Ltd., ASC, SP Land, and S-K-I, Ltd. "owed a duty to lifetime passholders to properly disclose their obligations to the lifetime passholders and to protect the interests of these passholders in the 2007 purchase agreement and related transactions." Complaint, ¶ 39. Plaintiffs assert that "[s]uch duty arises directly from the 1996 merger transaction, from the passes themselves, and from the actions of the parties over the years." (Doc. 184 at 34). Indeed, Plaintiffs assert that Killington, Ltd.'s sale of the Killington Ski Resort without securing a promise from the Buyer to honor the AT and P Passes renders the passes lacking "all mutuality, bordering on the fraudulent." (Doc. 184 at 35.) Plaintiffs further assert that, with knowledge of the obligations underlying Plaintiffs' passes, "the owner and operator Defendants proceeded to directly 'undermine or destroy' Plaintiffs' rights to receive the benefits of their passes by deciding that the passes were suddenly no longer valid." ( Doc. 184 at 33.) They contend this is the type of "bad faith" that "violates community standards of decency, fairness or reasonableness." (Doc. 184 at 33.)

Pursuant to Vermont law, "a covenant of good faith [and fair dealing] is implied in

every contract." *Carmichael v. Adirondack Bottled Gas Corp.*, 161 Vt. 200, 208, 635 A.2d 1211, 1216 (1993).[11] "The covenant's purpose is to ensure 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *Lopresti v. Rutland Reg'l Health Servs., Inc.*, 2004 VT 105, ¶ 36, 177 Vt. 316, 865 A.2d 1102 (quoting *Restatement (Second) of Contracts* § 205 cmt. a (1981)). "Whether a party has acted in 'good faith is ordinarily a question of fact, one particularly well-suited for juries to decide.'" *Howard Opera House Assocs. v. Urban Outfitters, Inc.*, 166 F. Supp. 2d 917, 934 (D.Vt. 2001) (quoting *Carmichael*, 161 Vt. at 209, 635 A.2d at 1217)). This does not mean, however, that the claim is not susceptible to pre-trial dismissal. *Id.* ("Summary judgment will be granted on a claim for breach of the implied covenant of good faith and fair dealing where the nonmoving party cannot show how the other undermined or destroyed its rights under the contract.").

In opposing summary judgment, a party asserting a breach of the implied covenant must be prepared to sustain the following burden:

> To carry its burden for the good-faith-and-fair-dealing claim, [the plaintiff] must produce evidence that could lead a reasonable jury to conclude that [the defendant] "breached an implied-in-law promise not to do anything to undermine or destroy [the plaintiff's] rights to receive the benefit of the parties' . . . agreement." The covenant of good faith and fair dealing is implied in every contract; its boundaries, however, are contextual and fact-

---

[11] A non-exhaustive list of acts and omissions that may give rise to a breach of the implied covenant of good faith and fair dealing includes:

> evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance. Further, bad faith inheres in harassing demands for assurances of performance, rejection of performance for unstated reasons, willful failure to mitigate damages, and abuse of a power to determine compliance or to terminate the contract.

*Carmichael*, 161 Vt. at 209, 635 A.2d at 1217 (quoting *Restatement (Second) of Contracts* § 205 cmt. d, e (1981) (internal citations omitted)).

26

specific. The covenant "is an implied promise that protects against conduct [that] violates community standards of decency, fairness or reasonableness." Good faith is ordinarily a question of fact. However, plaintiff must provide a basis on which the fact finder can find a violation.

*R & G Properties, Inc.*, 2008 VT 113, ¶ 46, 184 Vt. 494, 968 A.2d 286 (internal citations omitted).

1. *Plaintiffs' Implied Covenant Claim Against ASC, SP Land, and S-K-I, Ltd.*

Defendants, ASC, SP Land, and S-K-I, Ltd., assert that they have never been parties to any contract with Plaintiffs and thus cannot be held liable for a breach of the implied covenant of good faith and fair dealing. The court agrees.

"A cause of action for breach of the covenant of good faith can arise only upon a showing that there is an underlying contractual relationship between the parties . . . ." *Harsch Properties, Inc.*, 2007 VT 70, ¶ 14, 182 Vt. 196, 932 A.2d 1045 (citing *Monahan*, 2005 VT 110, ¶ 54 n.5, 179 Vt. 167, 893 A.2d 298); *accord Brown v. Windham Northeast Supervisory Union*, 2006 WL 2548198, at * 16 (D.Vt. Aug. 31, 2006) ("The implied covenant of good faith and fair dealing arises only between parties to a contract."); *Peerless Ins. Co. v. Frederick*, 177 Vt. 441, 446, 869 A.2d 112, 116 (2004) ("[T]he duty of good faith and fair dealing arises solely because of the presence of the . . . contract.") (citation omitted). Plaintiffs have adduced no evidence of a contract between the AT and P passholders and Defendants ASC, SP Land, and S-K-I, Ltd. Accordingly, a cause of action for breach of the implied covenant of good faith and fair dealing does not lie against these Defendants as a matter of law.

Defendants ASC, SP Land, and S-K-I, Ltd.'s motions for summary judgment with regard to Count II of the Complaint are therefore GRANTED.

2. *Plaintiffs' Implied Covenant Claim Against Killington, Ltd.*

Plaintiffs' implied covenant claim against Killington, Ltd., presents a closer question. There is no dispute that, prior to the closing, Killington, Ltd. had a contractual obligation to provide free skiing at the Killington Ski Area to the AT and P passholders.

There is also no dispute that Killington, Ltd. included certain "lifetime passes" in the Purchase Agreement, but did not include the AT and P Passes, even after they were disclosed. In their implied covenant claim, Plaintiffs properly allege conduct that is separate and distinct from their breach of contract claims. *See Harsch Properties, Inc.*, 2007 VT 70, ¶ 14, 182 Vt. 196, 932 A.2d 1045 ("A breach for violation of the implied covenant may form a separate cause of action than for breach of contract, as long as the counts are based on different conduct.").

Plaintiffs assert that the implied covenant of good faith and fair dealing required Killington, Ltd. to disclose and protect the AT and P Passes in the event of a sale. They contend this obligation arises from the passes themselves, the 1996 merger, ASC's SEC filings, and the parties' course of conduct. Plaintiffs further allege that Killington, Ltd. has "breached an implied-in-law promise not to do anything to undermine or destroy [Plaintiffs'] rights to receive the benefit of the parties' . . . agreement." *R & G Properties, Inc.*, 2008 VT 113, ¶ 46, 184 Vt. 494, 968 A.2d 286 (internal citations omitted). Plaintiffs' implied covenant claim against Killington, Ltd. cannot survive summary judgment for the following reasons.

First, the AT and P Passes themselves impose no duty on Killington, Ltd. to disclose or protect them in the event of a sale. Plaintiffs also point to no promise or representation in either the 1996 merger or in ASC's SEC filings that the AT and P Passes would be honored in the event of a sale. Although Plaintiffs cite evidence that certain Ski Resort employees, and even managers, believed and represented that the AT and P Passes were "lifetime" passes that would be honored in the event of a sale, they do not establish a modification of the unambiguous terms and conditions of the AT and P Passes on this basis.[12] *See Harsch Properties, Inc.*, 2007 VT 70, ¶ 12, 182 Vt. 196, 932 A.2d 1045 (an

---

[12] Plaintiffs make no claim that the AT and P Passes were issued in conjunction with these representations. They also do not allege, much less demonstrate, that Killington, Ltd. authorized its employees to modify the terms of the AT and P Passes.

unambiguous contract cannot be modified by extrinsic evidence). Holders of AT and P Passes were thus on notice by virtue of the plain language of the passes themselves that Killington, Ltd.'s obligations thereunder were not unlimited. They were also on notice that nothing in the AT and P Passes prohibited Killington, Ltd. from ceasing its operations and selling its assets.

Second, Plaintiffs fail to establish that they have been deprived of the benefit of their contracts or that the AT and P Passes lack "all mutuality" and are "fraudulent" if they are not honored in the event of a sale. The AT and P Passes were issued over fifty years ago and thus have already provided passholders with decades of free skiing, together with an appreciation of their stock interest in Sherburne/Killington, Ltd. Accordingly, this is not a case in which Killington, Ltd. issued the AT and P Passes, obtained Plaintiffs' investment, and shortly thereafter sold the Killington Ski Resort, thereby depriving Plaintiffs of the benefit of their agreement. To the contrary, Killington, Ltd. has performed for years under the parties' agreement and has only recently exercised its right to terminate its operations.

Third, while it is true that Killington, Ltd. *could have* protected the AT and P Passes in the event of a sale, a contracting party's *ability* to perform an act that benefits the other party to the contract does not necessarily translate into an *obligation* to do so. "The covenant of good faith and fair dealing 'does not obligate a [party] to take affirmative actions that the [party] is clearly not required to take under [the contract].'" *Eastern Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 182 (4th Cir. 2000) (citation omitted) (cited with approval in *Downtown Barre Dev.*, 2004 VT 47, ¶ 18, 177 Vt. 70, 857 A.2d 263); *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005) (implied duty of good faith and fair dealing cannot be used to "add[] to the contract a substantive provision not included by the parties") (quotation omitted); *Compania Embotelladora del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 324 (S.D.N.Y. 2009) (implied covenant "cannot be used to impose 'obligations that were not explicitly part of the

29

agreement'") (citation omitted). Vermont courts have thus readily dismissed implied covenant claims on summary judgment where the claims are based solely upon conduct within a contracting party's rights.[13]

Finally, although Plaintiffs couch their claim as a duty to disclose and protect the AT and P Passes, in essence what they seek is for the court to impose an obligation on Killington, Ltd. to forfeit some portion of the purchase price so that Plaintiffs may continue to receive free skiing. In exchange for this additional obligation, Killington, Ltd. would receive nothing in return from Plaintiffs. *See Morrison v. Heath*, 11 Vt. 610, 611 (1839) (it is well-established that obligations added to a contract must be supported by additional consideration). Correspondingly, Plaintiffs' claim, if accepted, would further require Killington, Ltd. to refuse to consummate a sale with any buyer who refused to honor the AT and P Passes. Plaintiffs simply did not contract for these benefits. As a result, they cannot be imposed by way of the implied covenant of good faith and fair dealing. *See R & G Properties, Inc.*, 2008 VT 113, ¶ 46, 184 Vt. 494, 968 A.2d 286 (implied covenant only protects those benefits to which a party is entitled under the contract).

The Vermont Supreme Court has held that the implied covenant is "contextual and

---

[13] *See Lopresti*, 2004 VT 105, ¶ 39, 177 Vt. 316, 865 A.2d 1102 (summary judgment is proper because "the covenant does not apply . . . when the plaintiff's argument amounts to no more than an objection to the other party's freedom to avail itself of [a right to] terminat[e] the agreement for reasons that the other party does not accept."); *Boulton v. CLD Consulting Eng'rs, Inc.*, 2003 VT 72, ¶ 12, 175 Vt. 413, 834 A.2d 37 (summary judgment upheld where no reasonable jury could find that defendant breached the implied covenant when it demoted plaintiff without evidence demonstrating that defendant violated community standards of decency, fairness, or reasonableness); *Dicks v. Jensen*, 172 Vt. 43, 52, 768 A.2d 1279, 1286 (2001) (summary judgment granted as no violation of the implied covenant may be found where employee left employment consistent with his right to do so); *Catamount/Infill Springfield, LLC v. UPS Capital Business Credit*, 2007 WL 5319750 *3 (Vt. March Term 2007) (Unpublished Entry Order) (summary judgment appropriate where creditor's protection of its interests through notice of public sale was within its rights and "can hardly be characterized as an act of bad faith contrary to community standards of decency and fairness.").

fact-specific." *R & G Properties, Inc.*, 2008 VT 113, ¶ 46, 184 Vt. 494, 968 A.2d 286.
Here, the operative facts establish that Killington, Ltd. was free to sell its interests in the
Killington Ski Resort to a bonafide purchaser. In such event, Killington, Ltd. was not
required to disclose and protect the AT and P Passes. Killington, Ltd. honored the AT and
P Passes, in accordance with their terms, for over fifty years. Plaintiffs have not
established they were entitled to more. After ample discovery, Plaintiffs do not identify
any "conduct [by Killington, Ltd.] that violates community standards of decency, fairness
or reasonableness." *Carmichael*, 161 Vt. at 209, 635 A.2d at 1216. Accordingly, even
when regarded in the light most favorable to Plaintiffs, the facts "do not come close to
providing a basis on which a jury could determine that the covenant of good faith and fair
dealing has been violated." *Boulton v. CLD Consulting Engineers, Inc.*, 2003 VT 72, ¶¶
12-13, 175 Vt. 413, 834 A.2d 37 (summary judgment was properly granted to a defendant
who neither abused its authority nor lacked a reasonable basis for its actions with respect
to plaintiff).

Because Plaintiffs have failed to establish the essential elements of a breach of the
implied covenant of good faith and fair dealing claim against Killington, Ltd., the court
hereby GRANTS summary judgment in Killington, Ltd.'s favor on Count II of the
Complaint.

### III. Conclusion.

For the reasons stated above, Defendants' motions for summary judgment are
hereby GRANTED and Plaintiffs' Complaint is hereby DISMISSED. Defendants' joint
motion to bifurcate is accordingly DISMISSED AS MOOT.
SO ORDERED.

Dated at Burlington, Vermont this 17th day of May, 2010.

Christina Reiss
United States District Judge

31